1

2

3                     UNITED STATES DISTRICT COURT

4                    NORTHERN DISTRICT OF CALIFORNIA

5

6

7    JORGE RODRIGUEZ,                        Case No.  14-cv-00976-VC  (PR)

                    Petitioner,
8                                            **ORDER DENYING PETITION FOR**
                                             **WRIT OF HABEAS CORPUS AND**
9           v.                               **DENYING CERTIFICATE OF**
                                             **APPEALABILITY**
     FRED FOULK,
10
                    Respondent.[1]
11

12

13         Jorge Rodriguez has filed a federal habeas petition challenging the validity of his

14   conviction, following a jury trial, of two counts of murder, with special circumstances findings of

15   multiple murder and felony murder in the course of a robbery.  He claims the trial court violated

16   his constitutional rights by: admitting his co-defendant's out-of-court statements; admitting

17   statements of an unavailable witness; failing to limit the scope of the impeachment of his expert

18   witness; failing to dismiss a biased juror; and failing to grant his motion to substitute counsel.  He

19   also claims the special circumstances statute is unconstitutional.  Because none of these claims

20   warrants habeas relief, the petition is denied.

21                                    **BACKGROUND**

22         On June 2, 2009, the Alameda County District Attorney charged Rodriguez and co-

23   defendant Shawndra Star Boode with two counts of murder and alleged the special circumstances

24   of multiple murder and felony murder in the course of a robbery and that a principal was armed

25

26   ──────────────
     [1]Pursuant to Habeas Rule 2(a) and Federal Rule of Civil Procedure 25(d)(1), the Clerk is directed
27   to substitute Acting Warden Suzanne Peery as Respondent because she is Petitioner's current
     custodian.
28

United States District Court
Northern District of California

1   with a firearm.  Clerk's Transcript ("CT") 1420-28; 3167-75.  On April 1, 2010, a jury found

2   Rodriguez and Boode guilty as charged and the special circumstances and enhancement

3   allegations true.  CT 1623-30; 3338-45.  Rodriguez was sentenced to state prison for 52 years to

4   life, plus life without the possibility of parole.  CT 3548-52.

5        On direct review, the California Court of Appeal affirmed the judgment.  Ex. A, *People v.*

6   *Rodriguez, et al.*, 2012 WL 4815082 (Cal. Ct. App. Oct. 10, 2012) (unpublished).  On January 16,

7   2013, the California Supreme Court denied review.  Ex. B.

8        On March 3, 2014, Rodriguez filed this federal petition for a writ of habeas corpus, which

9   is now fully briefed on the merits.

10       The California Court of Appeal summarized the facts as follows:

11       On January 17, 2004, Rodriguez and Boode shot and killed David and Catherine Brooks

12  ("Dave and Cathy") in order to steal approximately $380,000 Dave had recently received in

13  settlement for an on-the-job injury.  Dave and Cathy rented out rooms in their Hayward, California

14  home to help pay their rent.  Boode rented one of the rooms.  Dave and Cathy told many people,

15  including Boode, that they were expecting to receive a large sum of money.  Both Dave and Cathy

16  died of a gunshot wound to the head at close range.

17       The prosecutor's chief witnesses, Peter Elisary and Jeffery DeTar, played a role in the

18  murders and testified under grants of immunity.  Boode persuaded Elisary and Rodriguez to

19  participate in the robbery attempt.  On the night of the murders, Boode, Rodriguez and Elisary

20  ingested methamphetamine and discussed the robbery.  At about two, three or four in the morning,

21  they set out to commit the robbery.  Elisary drove a white Camaro, which was borrowed from

22  Rodriguez's sister.  Boode had a .357 revolver.  Elisary stayed in the car while Rodriguez and

23  Boode went into Dave and Cathy's house.  Ten to fifteen minutes later, Rodriguez and Boode

24  "speedwalked" back to the Camaro and got into the car.  They both appeared nervous.  Elisary

25  drove the Camaro back to Rodriguez's house where Boode and Rodriguez immediately took

26  showers.

27       Boode told Elisary that she demanded money from Dave and then she shot him in the back.

28  She heard a noise in the kitchen, turned and saw Cathy, chased Cathy into the bedroom and shot

United States District Court
Northern District of California

her in the neck or facial area.  Rodriguez told Elisary that he went behind Dave and was choking him with a string or cord.  Rodriguez let Dave go and Dave tried to attack Rodriguez.  In an attempt to make it look like a murder-suicide, Rodriguez cleaned the .357 revolver and put it in Cathy's hand with a spent casing.

DeTar, who also rented a room from Dave and Cathy, agreed to assist Boode in stealing Dave's check by alerting her when Dave and Cathy were home alone.  On January 17, 2004, DeTar called Boode to report that Dave and Cathy had arrived home and that he planned to leave. Later DeTar took a telephone call from Boode, who said, "I got that bitch."  When DeTar saw Boode in person, she told him that she had a wrestling match with Cathy in the hallway, that she had "gotten" her in the bedroom and that Dave had been shot also.  She claimed they found a check for $500,000 and that they killed the victims because they did not want the victims to identify them.

At trial, Rodriguez's sister, Ana Rodriguez, claimed not to remember her statement to the police.  She testified that she did not remember telling the investigator that: (1) on the night of the murders, Rodriguez, Boode and Elisary left in her white Camaro after she loaned them the car; (2) she saw Boode with a black gun; (3) she observed Rodriguez, Boode and Elisary return in the white Camaro in the early morning hours of January 17, 2004; (4) after they returned, she observed Boode take off her clothes and put them in the garbage bag; (5) Rodriguez told her that he was the lookout, that the victims were awake, that things got out of hand, and that the victims were screaming; (6) Boode showed her a check for over $200,000; and (7) Rodriguez tore up the check after Ana told him it was no good and he should get rid of it.

When the coroner's office moved Dave's body, they found a white telephone cord under his head and a black wool cap under his body.  The knit cap yielded a "mixed DNA profile," meaning that DNA from multiple contributors was found on the cap.  Rodriguez could not be excluded as a possible contributor to the DNA profile.

Neither Rodriguez nor Boode testified.  Their defense was that the prosecution witnesses had made numerous conflicting statements about the events in question and could not be trusted to give reliable testimony.  They characterized the prosecution's chief witnesses as longstanding

1   methamphetamine users, whose testimony was unreliable, self-interested and untrustworthy.  The

2   defense presented the expert testimony of Dr. Stephen Pittel, a forensic psychologist, about the

3   effects of methamphetamine abuse on a person's memory, perception and general reliability.  Dr.

4   Pittel testified that long-term methamphetamine users are "very, very unreliable in their memories

5   because of the effect of the drug," and "their attention is wandering all over the place and they're

6   constantly seeing and hearing things that other people aren't seeing and hearing."

7        The case was argued and submitted the the jury on March 30, 2010.  After deliberating two

8   hours, the jury convicted Rodriguez and Boode on all counts, special findings and special

9   circumstances.  *Rodriguez*, 2012 WL 4815082, at *1-4.

10                        **LEGAL STANDARD**

11        A federal court may entertain a habeas petition from a state prisoner "only on the ground

12   that he is in custody in violation of the Constitution or laws or treaties of the United States."  28

13   U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

14   a district court may not grant habeas relief unless the state court's adjudication of the claim:

15   "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

16   established Federal law, as determined by the Supreme Court of the United States; or (2) resulted

17   in a decision that was based on an unreasonable determination of the facts in light of the evidence

18   presented in the State court proceeding."  28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362,

19   412 (2000).  "[A] federal habeas court may not issue the writ simply because that court concludes

20   in its independent judgment that the relevant state-court decision applied clearly established

21   federal law erroneously or incorrectly."  *Id.* at 411.  A federal habeas court making the

22   "unreasonable application" inquiry should ask whether the state court's application of clearly

23   established federal law was "objectively unreasonable."  *Id.* at 409.

24        When there is no reasoned opinion from the highest state court to consider the petitioner's

25   claims, the court looks to the last reasoned opinion of the highest court to analyze whether the

26   state judgment was erroneous under the standard of § 2254(d*).  Ylst v. Nunnemaker*, 501 U.S. 797,

27   801-06 (1991).  In this case, the California Court of Appeal is the highest court to issue a reasoned

28   decision on Rodriguez's claims.

United States District Court
Northern District of California

4

1

## DISCUSSION

2

**I. Admission of Boode's Statements to DeTar**

3

### A.  Background

4

The Court of Appeal provided the relevant background to this claim as follows:

5
6
7

> Rodriguez contends the trial court erred under *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton* ) and *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*), when at his joint trial with Boode, the court admitted statements made by Boode to a third party that were incriminating to Rodriguez.  FN5

8
9
10

>> FN5  In analyzing this issue, we emphasize at the outset that the United States Supreme Court cases, rather than *Aranda*, govern because "[t]he question before this court is one of federal constitutional law. . . ."

11

> During the prosecutor's direct examination of Jeffery DeTar, the following exchange took place:

12
13

> "Q. Now, did you get the keys from Shawndra [Boode] at the gas station?

> "A. Yes.

14
15

> "Q. Did you talk to Shawndra at the gas station?

> "A. Yes.

16
17

> "Q. Did you talk to Shawndra about what happened with Dave and Cathy at the gas station?

18

> "A. Yes.

19

> "Q. What did she say?

20

> "A. She said—

21

> "[Defense Counsel]: Objection.  Calls for hearsay.

22

>  "The Court: Overruled.

23

>  "The Witness: She said that they—

24

>  "[Defense Counsel]: I request a limiting instruction, Your Honor.

25

>  "The Court: Make sure you just say what Shawndra said to you.

26

>  "The Witness: She said that they had gotten into the house.

27

>  "[The Prosecutor]: Did she say what happened inside the house?

28

>  "A. Yes.

United States District Court
Northern District of California

"Q. What did she say happened when she got into the house?

"A. That *they* had gotten him, popped him."  (Italics added.)

 The court then interjected, "Just say what [Boode] said she did."

Rodriguez argues that DeTar's use of the word "they" twice in the challenged passage directly implicated Rodriguez and that the trial court erred in failing to sustain hearsay objections, in failing to give a limiting instruction, and in failing to strike DeTar's offending testimony.

*Rodriguez*, 2012 WL 4815082, at *7-8 (footnote and emphasis in original).

### B. Federal Authority

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI. The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  *Crawford v. Washington*, 541 U.S. 36, 61 (2004). It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.  *Id.*

The Confrontation Clause applies to all "testimonial" statements.  *Id.* at 50-51.  "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact."  *Id.* at 51 (internal quotation and citation omitted).  A person "who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."  *Id.*  The Confrontation Clause applies not only to in-court testimony but also to out-of-court statements introduced at trial, regardless of the admissibility of the statements under state laws of evidence.  *Id.* at 50-51.

A defendant is deprived of his Sixth Amendment right of confrontation when a facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant.  *Bruton v. United States*, 391 U.S. 123, 126, 135-36 (1968).  Where the codefendant's confession does not on its face incriminate the defendant, but rather will only incriminate the defendant if "linked" with other evidence introduced at trial, and the confession is redacted to eliminate not only the defendant's name, but any reference to his existence, the Confrontation Clause is not violated by admission of

the confession with a proper limiting instruction to the jury.  *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).  If, however, the codefendant's confession is redacted to remove all direct reference to the defendant by replacing references with blanks or the word "deleted," the confession will violate the Confrontation Clause if introduced into evidence because, despite being redacted, the confession obviously refers directly to someone, most likely the defendant.  *Gray v. Maryland*, 523 U.S. 185, 191-95 (1998); *United States v. Peterson*, 140 F.3d 819, 822 (9th Cir. 1998) (use of "person X" in redacted statement violated Confrontation Clause).  The use of a collective noun, e.g., "guys" or "individuals," that could include the defendant but does not refer specifically to him may be permissible.  *United States v. Peterson*, 140 F.3d 819, 822 (9th Cir. 1998).

A *Bruton* claim, like all other Confrontation Clause claims, is subject to harmless error analysis.  *United States v. Rashid*, 383 F.3d 769, 775-77 (8th Cir. 2004) (applying harmless error analysis to claim of *Bruton* error after *Crawford*).

### C. Analysis

DeTar's testimony did not violate *Bruton*.  First, his challenged statements did not facially incriminate Rodriguez.  DeTar's testimony made no direct reference to anyone other than Boode and, at most, indicated that Boode and an unspecified number of unidentified people, who he referred to as, "they," accompanied her into the victims' house and shot Dave.  These statements are the type of redacted statements described in *Gray* as ones that would avoid *Bruton* error.  *See Gray* 523 U.S. at 196.

Second, the challenged statements were not testimonial.  They were an account of the crime that Boode related to her friend, DeTar, at a gas station.  It was not a statement to a government official intended to be used as evidence at a trial.  *Bruton* does not apply to nontestimonial statements.  *See e.g. United States v. Berrios*, 676 F.3d 118, 128 (3d Cir. 2012)("because *Bruton* is not more than a by-product of the Confrontation Clause, *Crawford* limits *Bruton* to testimonial statements); *United States v. Figueroa-Cartagena*, 612 F.3d 69, 85 (1st Cir. 2010) (same).

1    **II. Admission of Huapaya's Statement to Sergeant Stewart**

2         **A. Background**

3         The Court of Appeal provided the background relevant to this claim as follows:

4              Rodriguez claims he was deprived of a fair trial, due process, and
              his right of confrontation by the court's erroneous admission of a
5              police officer's recitation of an out-of-court declarant's statements
              during the investigation of the murders that were admitted to explain
6              why the police investigation focused on Rodriguez. . . .

7              At trial, the prosecution was granted permission to read the
              preliminary hearing testimony of witness Enrique Huapaya after he
8              was deemed unavailable, following the prosecution's demonstration
              of due diligence to locate him.  The testimony was read into the
9              record in question-and-answer form. . . .

10             In providing the jury background information for introducing
              Huapaya's preliminary hearing testimony, Sergeant Stuart testified
11             about how Huapaya approached police with information about the
              murders:  "Mr. Huapaya had been arrested for a drug possession,
12             and he had told the officers that arrested him that he had information
              about the murders."  Sergeant Stuart indicated that "Mr. Huapaya
13             was looking to talk to the detective or inspector who was
              investigating the crime and, in turn, would want some type of
14             consideration for the case which he had been arrested for."
              Subsequently, Sergeant Stuart testified that during his interview with
15             Huapaya about the information he had about the murders, Huapaya
              reported that Rodriguez told him (1) that "he got involved in the
16             murders over dope and money;" and (2) that the victims "were
              murdered because they could identify who had robbed them."

17
              Rodriguez's counsel made an ongoing hearsay objection to Sergeant
18             Stuart's testimony describing statements made by Huapaya during
              his police interview that were not under oath and not subject to
19             cross-examination.  (Evid. Code, § 1200, subd. (a).)  The prosecutor,
              however, argued that the evidence was admissible on the nonhearsay
20             basis that it explained the subsequent conduct of the police, and the
              trial court admitted it on that basis.  The jury was admonished that
21             the challenged evidence was not being admitted for its truth but to
              show "what this sergeant did in response to that information," and it
22             was given a limiting instruction to that effect.

23             On appeal, Rodriguez asserts that the good faith or reasonableness
              of the police conduct was not at issue in this case and therefore, the
24             details of Huapaya's out-of-court statements to Sergeant Stuart were
              inadmissibly placed before the jury at trial. . . .

25    *Rodriguez*, 2012 WL 4815082, at *10.

26         The Court of Appeal agreed with Rodriguez that the trial court erred in admitting the

27    challenged evidence.  However, the Court of Appeal concluded the error was harmless because

28

United States District Court
Northern District of California

1   Stuart's testimony was cumulative to other properly admitted evidence.  *Id.* at 11.

2       **B. Federal Authority**

3         The admission of evidence is not subject to federal habeas review unless a specific

4   constitutional guarantee is violated or the error is of such magnitude that the result is a denial of

5   the fundamentally fair trial guaranteed by due process.  *Henry v. Kernan*, 197 F.3d 1021, 1031

6   (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986).  The due process inquiry in

7   federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it

8   rendered the trial fundamentally unfair.  *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995);

9   *Colley*, 784 F.2d at 990.  Only if there are no permissible inferences that the jury may draw from

10  the evidence can its admission violate due process.  *Jammal v. Van de Kamp*, 926 F.2d 918, 920

11  (9th Cir. 1991).

12        Even if the trial court erred in admitting Huapaya's statement to Stuart, the error did not

13  have a substantial and injurious effect or influence on the jury's verdict because it was cumulative

14  to other evidence showing that the murders were motivated by a desire for the victims' money,

15  and not to be identified as the robbers.  *See* RT at 771 (Elisary testified that Boode told him she

16  demanded money from Dave and then "shot Dave in the back"); RT at 1022 (Richard Wallace

17  testified that Boode told him that she went to Dave and Cathy's to rob them, but something went

18  wrong and she shot them);  RT at 501, 1786 (DeTar testified that Boode wanted to rob a large

19  check from Dave and Cathy and then killed them because Dave and Cathy could identify Boode

20  and Rodriguez).

21        Furthermore, other evidence linked Rodriguez to the murders.  Evidence showed that the

22  knit cap found underneath Dave's body contained DNA that likely came from Rodriguez.  *See* RT

23  at 1146-47 (DNA analysis showed that the probability of selecting an unrelated individual at

24  random with the DNA profile from the knit cap was approximately "one in seven African-

25  Americans, one in 2500 Caucasians, and one in 600 Hispanics.").  Witnesses described Rodriguez

26  as a willing participant in planning the robbery and heard him describe himself as the "muscle" in

27  the plot.  RT at 744-45.  He obtained use of his sister's Camaro to commit the robbery.  RT at 771.

28  Ana Rodriguez told detectives that she saw Rodriguez destroy the insurance check obtained as loot

United States District Court
Northern District of California

9

United States District Court
Northern District of California

1    from the victims' house and that Rodriguez told her about his participation in the robbery-murder.

2    RT at 1328-30, 1341-46, 1347, 1349-50, 1362-63.  Given this strong evidence of Rodriguez' guilt,

3    any error in admitting Stuart's statements did not have a substantial and injurious effect or

4    influence on the jury's verdict.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (prejudice

5    standard for federal habeas review).

6    **III. Evidentiary Rulings Pertaining to Defense Expert Witness**

7          **A. Questioning Prosecution Witnesses About Their Methamphetamine Use**

8          The Court of Appeal provided the background relevant to this claim as follows:

9          Rodriguez alleges he was denied his Sixth Amendment right to
10   present a complete defense by (1) the trial court "precluding [him]
     from establishing an adequate foundation for Dr. Pittel's opinions
11   regarding the unreliability of testimony from methamphetamine
     abusers"; and (2) in "permitting the prosecution to unfairly impeach
12   Dr. Pittel with irrelevant and prejudicial cross-examination and
     argument." . . .

13         The testimony provided by the prosecution witnesses who played a
14   role in the crimes was obviously crucial to the prosecution's case
     against appellants.  Each of these witnesses, along with appellants
15   and the victims, were methamphetamine users.  The use of
     methamphetamine can, obviously, affect the ability of a witness to
16   perceive, to recall, and to recount the events he or she has observed.
     . . . "Evidence of consumption of narcotics" was thus an appropriate
17   subject of inquiry and impeachment "if there is expert testimony
     substantiating the effects of such use. [Citations.]" . . . Appellants
18   relied on Dr. Pittel to provide such expert testimony, as his area of
     expertise is establishing that long-term use of methamphetamine
19   affects perception and recall. Dr. Pittel testified, in his opinion, long-
     term methamphetamine users are "very, very unreliable in their
20   memories because of the effects of the drug."

21         In order to establish a foundation for Dr. Pittel's opinion,
     Rodriguez's trial counsel indicated that if given sufficient funds, she
22   would have "attempt[ed] to get a drug history from these witnesses
     so that Dr. Pittel can testify with some substance as to the effects of
23   this drug."  When such funds were not forthcoming, counsel
     requested permission to elicit the drug histories of the prosecution
24   witnesses during their testimony, so that Dr. Pittel could review and
     incorporate that information into his own testimony.  The trial court
25   limited counsel to asking each percipient witness, "what drugs they
     used and how long they've used it, period" and whether they were
26   "under the influence" during the events described in their testimony.
     In so ruling the court said, "We're not delving into a whole bunch of
27   stuff, because this does not need to be a mini trial on their drug use
     within this trial.  I think it's more time consuming than necessary to
28   go all into that, and it would be more prejudicial than probative just
     to them as human beings.  I mean, it's not really necessary." . . .

> On appeal, appellants argue that they were seriously disadvantaged by the "severe restriction" the trial court placed on questioning the prosecution witnesses about their drug usage which "precluded the defense from establishing an adequate foundation" for Dr. Pittel's testimony. Because of the court's ruling, Rodriguez complains that "Dr. Pittel could only provide opinions at a generic level, without any foundation for specifically addressing the likely effects on the individual witnesses, based on their personal and idiosyncratic drug histories."

*Rodriguez*, 2012 WL 4815082, at *12-13.

"State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (alteration in original); *see also Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (holding that due process does not guarantee a defendant the right to present all relevant evidence). This latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments. *Holmes*, 547 U.S. at 324. "While the Constitution prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* at 325-26; *see also Egelhoff*, 518 U.S. at 42-42 (due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion).

The Court of Appeal rejected this claim, concluding that the limitation of evidence did not prevent the jury from hearing "the facts bearing on the weight to be given the testimony of these prosecution witnesses because of their use of methamphetamine." *Rodriguez*, 2012 WL 4815082, at *13. That court also found the limitation on defense counsel probing into the full extent of the witnesses' history prevented the consumption of undue amounts of time on issues that were collateral to the defense. *Id.* This is an objectively reasonable application of established Supreme Court authority permitting trial judges to exclude probative evidence when it is outweighed by unfair prejudice or an undue use of time.

**B. Impeachment of Defense Expert**

The Court of Appeal presented the background relevant to this claim as follows:

> Rodriguez claims Dr. Pittel was "unfairly demeaned as a witness" when the trial court permitted the prosecutor to cross-examine him about his prior cocaine arrest in 1990 and to exploit that testimony in closing argument.

> Toward the end of trial, the prosecutor filed a written motion asking for permission to impeach Dr. Pittel with a 1990 arrest by the Fairfield police for drug use. Attached to the motion was the police report of the incident. At the time of the arrest, Dr. Pittel was testifying as a defense drug expert in a murder trial. His testimony was interrupted for the noon recess. Dr. Pittel went to his car, which was parked by a crosswalk in front of the Solano County Superior Court courthouse. An off-duty Vallejo police officer walked by and saw Dr. Pittel put something in his nose. The off-duty officer summoned a Fairfield police officer, who arrested Dr. Pittel after finding that he possessed a bindle of cocaine. While being arrested, Dr. Pittel asked the police officer not to arrest him because it would ruin his career. The Superior Court judge presiding over the murder trial was notified, and Dr. Pittel was placed on a no-bail hold for contempt of court.

> . . .

> After hearing argument, the trial court ruled that "Because this witness is testifying as an expert in this field of drugs, I am going to allow you [the prosecutor] very limited [scope in] asking him has he ever tried drugs, and then he can explain it was 20 years ago or whatever it was, because I think that was egregious conduct. I think the probative value outweighs the prejudicial [and] I think it does go to his credibility. . . ."

> On direct examination, defense counsel asked Dr. Pittel whether he had used any drugs, and Dr. Pittel stated, that "I've also used cocaine recreationally many, many years ago, but nothing in the last 20 or 25 years." Thereafter, on cross-examination, Dr. Pittel admitted that he had been arrested for using cocaine. Dr. Pittel explained that on December 26, 1990, he drove to Solano County Superior Court in Fairfield to testify in a murder case after a midnight dinner for some close friends. He had to drive to the airport in the morning because his daughter had to catch a 5:30 a.m. flight, so he was "out pretty much all night." He was "exhausted from not having slept the night before" and wanted to take a nap in his car when the court recessed for lunch, but he was concerned that if he fell asleep he wouldn't wake up in time to return to court. Therefore, he took some cocaine that he had "confiscated from a client" to increase his alertness. He was observed and arrested. Dr. Pittel explained that the charges were eventually dropped and he was never tried or convicted. " . . .

> During closing argument, without objection, the prosecutor argued, "Let's talk about Dr. Pittel, our drug expert, okay, the man who

1
2
> himself decided to do cocaine at the intermission of a murder trial
> and a trial which he was testifying at as a drug expert. And where
> did he get that cocaine? He took it from one of his patients. This is
> the guy that . . . the defense is asking you to rely heavily upon."

3
4
5
> On appeal, Rodriguez claims "Dr. Pittel's testimony would certainly
> have played a far more persuasive role in the jury's deliberations . . .
> if the prosecution had been precluded from unfairly tarnishing his
> reputation and testimony. . . ."

*Rodriguez*, 2012 WL 4815082, at *14.

6
7
8
9
10
11
12
13
14
15
No constitutional error occurred because Pittel's arrest for cocaine use was relevant to his credibility. *See Jammal*, 926 F.2d at 920 (only if there are no permissible inferences that jury may draw from evidence can its admission violate due process). Although the fact that the arrest occurred more than twenty years before the trial may reduce its probative value with respect to Pittel's credibility, this does not render it irrelevant. And as pointed out by the Court of Appeal, any prejudicial impact of the arrest was mitigated by Pittel's testimony describing the extenuating circumstances surrounding it, thus allowing the jury to consider it from his point of view. *Rodriguez*, 2012 WL 4815082, at *15. The Court of Appeal's denial of this claim was not contrary to or an unreasonable application of established federal authority.

## IV. Juror Bias

16
17
18
Rodriguez argues that he was deprived of his constitutional right to an impartial jury because a juror was biased after observing him conduct himself in the courtroom in what she perceived to be a threatening manner.

### A. Background

19
20
The Court of Appeal presented the background relevant to this claim as follows:

21
22
23
24
25
26
27
28
> During the trial, the court received a written message from Juror No.
> 8 saying that she had seen something frightening and that she
> wanted to talk about it without calling attention to herself. When
> Juror No. 8 was questioned by the court outside the presence of the
> jury, the juror said she had observed Rodriguez move his mouth to
> communicate with Elisary, one of the prosecution witnesses who
> had been testifying, in what Juror No. 8 perceived to be a
> threatening and intimidating manner. Juror No. 8 expressed fear
> from seeing Rodriguez give Elisary a "scary stare" and from
> "moving his lips and talking, saying something, just barely moving
> his lips." FN4 She stated she was "frightened" and the court
> acknowledged that she was crying. The trial court established that
> Juror No. 8 had not discussed her observations or fears with any
> other juror, and the court instructed her not to do so. The trial court

13

United States District Court
Northern District of California

> moved to allay any fear by stating "we'll just watch very carefully" and indicating the deputies would be instructed "to make sure that the jurors are protected."
>
>> FN4  It is likely that the event described by Juror No. 8 actually occurred because the trial judge indicated that a member of his courtroom staff had also reported that he thought he saw "Mr. Rodriguez mouthing something to Mr. Elisary. . . ."
>
> When asked if she would hold Rodriguez's actions against him, Juror No. 8 replied, "To be honest, I don't know."  When questioned whether she still could be fair and impartial, she replied, "I think I could decide the facts, but I would be scared if we convicted him."  When asked if she could vote "not guilty" if the People did not prove their case, she replied, "I think so," which she then defined as "in between" an affirmative and negative answer to that question.  In the end, she nodded her head up and down and said, "I think so" in answer to the court's question whether she could "keep an open mind" despite what she had observed.  The court denied appellants' motion to excuse Juror No. 8 for bias.

*Rodriguez*, 2012 WL 4815082, at *6.

The next Monday, defense counsel put on the record that they wanted to talk to Juror No. 8 some more, but the court denied the request.  RT 1431-32.  The trial court responded that the juror "seemed to have calmed down.  She seemed to have been okay as a juror. . . . I just didn't want to bring it back up again so that she would be concerned again. . . . I've been looking at her and I've been noticing whether or not she seems upset or anything, and she's been fine.  That was Thursday.  So we finished Thursday afternoon and we've been in session all day today, I mean half a day today.  And she seemed okay.  So I don't want to call any more attention to that issue than is necessary."  *Id.*

### B. Federal Authority

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors.  U.S. Const. amend. VI; *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury."  *Tinsley v. Borg*, 895 F.2d 520, 523-24 (9th Cir. 1990) (internal quotation marks omitted).  "Actual bias is typically found when a prospective juror states that he cannot be impartial, or expresses a view adverse to one party's position and responds equivocally as to whether he could be fair and impartial despite that view."  *Fields v. Brown*, 503 F.3d 755, 767 (9th

14

1   Cir. 2007) (en banc) (citations omitted).  To show the absence of actual bias, "it is sufficient if the

2   juror can lay aside his impression or opinion and render a verdict based on the evidence presented

3   in court." *Irvin v. Dodd*, 366 U.S. 717, 723 (1961).  The presence of an actually biased juror is

4   structural error, requiring a new trial without the need to show prejudice under *Brecht*.  *Smith v.*

5   *Swarthout*, 742 F.3d 885, 892 n.2 (9th Cir. 2014).

6        A court confronted with a colorable claim of juror bias will generally conduct a hearing

7   involving all interested parties to explore the issue of juror bias and provide the defendant an

8   opportunity to prove actual bias.  *Smith v. Phillips*, 455 U.S. 209, 215 (1982); *Hedlund v. Ryan*,

9   750 F.3d 793, 806 (9th Cir. 2014).  So long as the fact-finding process is objective and reasonably

10  explores the issues presented, the state trial judge's findings based on that investigation are

11  entitled to a presumption of correctness.  *Id.* at 807 (in a habeas proceeding, the trial judge's

12  findings on juror bias is presumed correct and cannot be overcome without clear and convincing

13  evidence).

14        **C. Analysis**

15        Rodriguez has failed to refute with clear and convincing evidence the trial court's factual

16  finding of no actual bias, which is presumed correct in this habeas proceeding.  The trial court held

17  an evidentiary hearing on Juror No. 8's concerns.  When Juror No. 8 was asked whether she could

18  vote guilty if the prosecutor proved the case beyond a reasonable doubt, she replied that she could,

19  but that she "would just go on being scared after that." *Id.*  When the trial judge asked her if she

20  could vote not guilty if the prosecutor did not prove the case beyond a reasonable doubt, she

21  replied, "I think so." *Id.*  When the trial court asked her if she could keep an open mind for both

22  sides, Juror No. 8 nodded her head up and down and replied, "I think so." *Id.*  Thus, despite Juror

23  No. 8's safety concerns, her responses to the trial court's questions showed that she intended to do

24  her best to be objective.  This is sufficient to prevent reversal on habeas review of the trial court's

25  conclusion that Juror No. 8 would keep an open mind and decide the case based on the evidence.

26  RT 1107-09.  *See Bashor v. Risley*, 730 F.2d 1228, 1237 (9th Cir. 1984) (no error in keeping juror

27  when juror responded to question of whether she could be impartial with, "Yes, I think I could.").

28  Furthermore, the trial court observed Juror No. 8 after the evidentiary hearing and noted that she

United States District Court
Northern District of California

15

1    she looked fine and did not appear to be upset.  RT 1431-32; s*ee Hedlund*, 750 F.3d at 807 (trial

2    court's findings about juror bias presumed correct).

3         Habeas relief is also not available because Rodriguez has not shown that the constitutional

4    error had a substantial and injurious effect or influence on the jury's verdict.  First, Rodriguez'

5    alleged conduct (staring at and mouthing words at the witness) was consistent with the witness'

6    testimony about Rodriguez.  *See Henry v. Ryan*, 720 F.3d 1073, 1085 (9th Cir. 2013) ("extraneous

7    information is less likely to be prejudicial when, as in this case, it 'merely confirmed what any

8    reasonable juror already knew'"); *Drayden v. White*, 232 F.3d 704, 710-11 (9th Cir. 2000) (finding

9    it unlikely petitioner's outburst prejudiced him by causing the jurors to think less of him than they

10   did before the outburst).  As the trial court and prosecutor suggested at the hearing, some of Juror

11   No. 8's distress may have been as much due to the testimony at trial about the murders, gangs, and

12   threats against witnesses as Rodriguez's in-court behavior.  *See* RT 1104, 1113.

13        Second, the incident occurred on the eleventh or twelfth day of a 21-day trial, long before

14   jury deliberations began.  As discussed previously, the jury was presented with substantial

15   evidence of Rodriguez' guilt.

16        Third, Juror No. 8 was exposed to the external influence for a very short amount of time; in

17   fact, neither the court nor counsel even noticed the incident that had taken place in open court.  *See*

18   *Henry*, 720 F.3d at 1086 ("The Supreme Court, for instance, has found juror misconduct to

19   warrant reversal in cases involving extended external influences on jurors or confirmed juror bias

20   – neither of which is present here").

21        Fourth, Juror No. 8 confirmed to the court that she had not discussed the matter with any

22   other juror, and was instructed not to discuss the matter with other jurors.  RT 1104.

23        Fifth, the jury deliberated only two hours before returning a verdict, suggesting this was

24   not a close case.  *See United States v. Lopez*, 500 F.3d 840, 846 (9th Cir. 2007) ("'Longer jury

25   deliberations weigh against a finding of harmless error because lengthy deliberations suggest a

26   difficult case.'").

27   **V. Special Circumstances Statute**

28        The Court of Appeal provided the background of this claim, as follows:

Appellants next jointly argue that the felony-murder special circumstance provisions in section 190.2, subdivision (a)(17),7 are not sufficiently different from the felony-murder theory of first-degree murder.  Therefore, the felony-murder special circumstance law does not conform to the constitutional requirement that it narrow the class of murders eligible for the death penalty or a sentence of life without the possibility of parole.  For this reason, they claim section 190.2, subdivision (a) violates principles established in the cruel and unusual punishment clause of the Eighth Amendment, and the due process clause of the Fourteenth Amendment.  FN7.

> FN7  Section 190.2, subdivision (a), provides in part, "The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.04 to be true: . . . (17) The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit, the following felonies:  (A) Robbery in violation of Section 211 or 212.5."

*Rodriguez*, 2012 WL 4815082, at *11 (footnote in original).

The Supreme Court has held that, to satisfy the Eighth Amendment in capital cases, "an aggravating factor that renders a defendant subject to the death penalty must reasonably distinguish his conduct from that of the general run of murderers not to be sentenced to death." *Bradway v. Cate*, 588 F.3d 990, 991 (9th Cir. 2009) (citing *Tuilaepa v. California*, 512 U.S. 967, 971-72 (1994)).  However, the Supreme Court has not applied this narrowing principal to cases where the sentence is not death.  *Id.* (denying Eighth Amendment challenge to Penal Code section 190.2(a)(15)); *Houston v. Roe*, 177 F.3d 901, 906 (9th Cir. 1999) (noting that Supreme Court has refused to extend narrowing principal to require states to distinguish between criminals sentenced to life without parole and those sentenced to life with parole).  Therefore, it was not unreasonable for the Court of Appeal to reject this claim by Rodriguez, who was sentenced to life without the possibility of parole.

## VI. Denial of Motion to Substitute Counsel

Rodriguez argues that the trial court's denial of his motion for substitute counsel violated his right to effective assistance of counsel and his right to testify in his own behalf.

The Court of Appeal provided the background for this claim, as follows:

United States District Court
Northern District of California

Following the jury's guilty verdicts, Rodriguez made an oral *Marsden* motion on May 21, 2010, challenging the effectiveness of his trial counsel's representation. As required by *Marsden*, the trial court asked Rodriguez to explain the inadequacies in his trial counsel's representation—that is, his past performance at trial—that made Rodriguez believe that he was entitled to new counsel at future parts of the criminal proceeding, such as a motion for new trial and sentencing. . . . Rodriguez provided numerous grounds upon which he believed his trial counsel had provided ineffective assistance during the trial, including the failure to deliver reporter's transcripts, investigate school records, produce Rodriguez's work schedule to prove employment, produce his incarceration records, investigate his pending "workman's comp" case, put on Huapaya's family members to impeach Huapaya, and present the testimony of an alibi witness.

When called upon to address these points, counsel asserted that he had explored Rodriguez's school history and "workers' comp" with Rodriguez's sister, Ana Rodriguez. Counsel explained that Rodriguez's "history of incarceration" would have been irrelevant and would have likely prejudiced the jury. Furthermore, "there's a box full of transcripts," and that counsel instead chose to discuss the prior testimony with Rodriguez. Counsel stated that his investigator obtained school records in anticipation of a possible death penalty case but that the school records did not assist in the guilt phase. Counsel determined that the potential alibi witness was lying and would not assist the defense. With respect to impeaching Huapaya, counsel was fearful of opening up "character for conduct which will allow the district attorney to read in a whole bunch of material that we were able to keep out."

The trial court found that the various matters raised by Rodriguez were tactical decisions within the purview of the attorney. "And the thing is Mr. Thews is the attorney, and he knows what things go and what things will not go because a lot of things will not help you."

*Rodriguez*, 2012 WL 4815082, at *16.

The denial of a motion to substitute counsel implicates a defendant's Sixth Amendment right to counsel and is properly considered in federal habeas. *Bland v. Cal. Dep't of Corr.*, 20 F.3d 1469, 1475 (9th Cir. 1994), *overruled on other grounds by Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000) (en banc). The ultimate inquiry in a federal habeas proceeding is whether the conflict between the petitioner and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in an attorney-client relationship that fell short of that required by the Sixth Amendment. *Schell*, 218 F.3d at 1026. For substitution of counsel to be constitutionally compelled, there must a complete breakdown in communication; mere friction and disagreement does not require new counsel. *Plumlee v. Masto*, 512 F.3d 1204,

1211 (9th Cir. 2008) (en banc).

The record supports the Court of Appeal's finding that Rodriguez' complaints about his attorney focused on tactical matters within the purview of trial counsel and did not involve an allegation of irreconcilable conflict. Rodriguez' argument amounts to a difference of opinion about trial tactics, which is insufficient to show that trial counsel's performance was deficient. *See Dows v. Wood,* 211 F.3d 480, 487 (9th Cir. 2000) (counsel's tactical decisions at trial are given great deference); *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981) (a difference of opinion as to trial tactics does not constitute denial of effective assistance). Because Rodriguez did not show that his counsel's performance was deficient or that there was an irreconcilable conflict, the Court of Appeal's denial of this claim was objectively reasonable.

Rodriguez also argues that the trial court erred by not responding to his request to represent himself which he expressed by stating that he needed information from his attorney "so I could hit the stand myself." *Id.* at *17. The Court of Appeal denied this claim because the request was not timely made to the trial court. *Rodriguez*, 2012 WL 4815082, at *17.

Although the right to testify on one's own behalf at a criminal trial is a constitutional right, *see Rock v. Arkansas*, 483 U.S. 44, 51 (1987), the waiver of the right may be inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify the court of his desire to do so, *see United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993). Rodriguez told the court that he wanted to "hit the stand himself" after the jury had delivered its verdicts. At that point, Rodriguez could no longer testify. He fails to show that, during the trial, he informed counsel or the trial court that he wished to testify. Therefore, during the trial, the trial court reasonably presumed Rodriguez had waived this right; any inquiry into it after his verdict was received would be futile.

## CONCLUSION

For the foregoing reasons, the Court orders as follows:

1. The Clerk shall substitute Acting Warden Suzanne Peery as Respondent.

2. Rodriguez's petition for a writ of habeas corpus is denied. A certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). This is not a case in which "reasonable jurists would find

United States District Court
Northern District of California

19

the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

3. The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: June 15, 2015

_____

VINCE CHHABRIA
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JORGE RODRIGUEZ,

            Plaintiff,

     v.

FEDRIC FAULK, et al.,

            Defendants.

Case No.  14-cv-00976-VC

**CERTIFICATE OF SERVICE**

      I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

      That on June 15, 2015, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Jorge  Rodriguez ID: Ad-5572
HDSP C-2 C-121
P.O. Box 3030
Susanville, CA 96127-3030

Dated: June 15, 2015

Richard W. Wieking
Clerk, United States District Court

By:_____
Kristen Melen, Deputy Clerk to the
Honorable VINCE CHHABRIA

21